# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-70003

United States Court of Appeals
Fifth Circuit

**FILED**

August 11, 2014

Lyle W. Cayce
Clerk

GILMAR ALEXANDER GUEVARA,

Petitioner–Appellant,

v.

WILLIAM STEPHENS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent– Appellee.

Appeal from the United States District Court
for the Southern District of Texas
U.S.D.C. No. 4:08-CV-1604

Before STEWART, Chief Judge, and OWEN and GRAVES, Circuit Judges.

PER CURIAM:*

Petitioner Gilmar Guevara requests that this court grant a Certificate of
Appealability (COA) to conduct appellate review of the district court's denial
of his federal habeas claims, including two claims of ineffective assistance of
counsel and one claim that, under *Atkins v. Virginia*, 536 U.S. 304 (2002),
Texas may not execute him because he suffers from an intellectual disability.[1]
For the reasons herein, we DENY his application for a COA.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH
CIR. R. 47.5.4.

[1] Although previous opinions use the term "mental retardation," the preferred terminology
is now "intellectual disability." *See Hall v. Florida*, 134 S. Ct. 1986, 1990 (2014).

No. 13-70003

## I.

Guevara shot and killed Tae Youk and Gerardo Yaxon on June 2, 2000 at a Houston convenience store. Guevara told police that on the night of the murders one of his friends suggested that they "go to the store there" to "get the money." Guevara shot both store attendants after one hit him. Guevara and his friends left the store without taking anything. Just hours after murdering Youk and Yaxon, Guevara killed Freddy Marroquin, an apartment security guard, to steal his gun. Guevara was charged with capital murder for the shootings of Youk and Yaxon. The jury ultimately found Guevara guilty of the capital murder of both victims.

As part of their mitigation investigation for the punishment phase of the trial, Guevara's court-appointed attorneys interviewed him, contacted his brother Benjamin and sister Sonia Sorto, and attempted to locate his wife Nancy. His trial counsel thoroughly discussed Guevara's background and childhood with both Guevara and his brother, focusing on the trauma caused by growing up during El Salvador's civil war. They also asked questions of both men to explore the possibility of mitigation evidence relating to post-traumatic stress disorder (PTSD), immigrant trauma, ID, head injuries, psychological health, abuse, or any other possible psychological problems. Neither offered any information suggesting these avenues should be further explored. Trial counsel also spoke with Sorto, but she indicated that she did not want to take part in the trial process. Guevara's wife could not be located.

During the punishment phase, the prosecution introduced aggravating evidence regarding Guevara's previous convictions and criminal conduct, which included theft, carrying a weapon, unauthorized use of a motor vehicle, auto theft, repeated parole violations, and convenience-store robberies during which he had fired shots and inflicted permanent injuries. He later "bragged about robbing some 'Ghandis' and about . . . pistol-whipping one of the

'Ghandis' when he made too much noise." Furthermore, only hours after committing the murders for which the jury convicted him, Guevara killed another person to take his weapon. The prosecution argued in closing that Guevara would be a danger throughout his life.

Guevara's trial counsel did not call punishment-phase witnesses. They had planned to call Benjamin at the punishment phase of trial to testify about Guevara's childhood during the war, but decided not to call him because they worried that his testimony might do more harm than good. Following particularly powerful testimony by the mother of Marroquin, who had also come from El Salvador, counsel were concerned such testimony might demean Marroquin and prompt comparisons between Guevara and both Benjamin and Marroquin.

After the punishment phase, the jury responded affirmatively to the question, "Do you find from the evidence beyond a reasonable doubt that there is a reasonable probability that [Mr. Guevara] would commit criminal acts of violence that would constitute a continuing threat to society?" *See* Tex. Code Crim. Pro. § 37.071(2)(b)(1). The jury responded negatively to the question, "Do you find . . . taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of [Guevara], . . . that there [are] sufficient mitigating . . . circumstances to warrant [a life sentence]." *Id.* § 37.071(2)(d)(1). These responses to the special issues required the death penalty. Accordingly, Guevara was sentenced to death. He was unsuccessful in appealing his conviction. *See Guevara v. State*, 97 S.W.3d 579 (Tex. Crim. App. 2003).

Guevara thereafter filed a state application for habeas corpus relief claiming ineffective assistance of counsel (IAC claim). He argued, *inter alia*, that his trial counsel had been ineffective for failing to investigate evidence of

his troubled childhood, PTSD, and immigrant trauma. He also relied on a declaration from mitigation expert Gina T. Vitale. Vitale provided information on Guevara's work history, reporting that he worked various jobs including in an auto body shop, as a line chef, and as a repair man in his apartment complex. Her sources stated that he was "very adept at welding" and "an excellent worker." The owner of the apartment complex was "so pleased with Guevara's work" that he hired Guevara to work with the "head maintenance man."

Three years after filing this initial state habeas application, but before the Texas Court of Criminal Appeals had ruled, Guevara filed a subsequent habeas application claiming that his intellectual disability precluded him from being executed. In this successive habeas application, Guevara argued that he had introduced evidence to make out a prima facie case that he suffered from intellectual disability and was thus ineligible for the death penalty under *Atkins*. He argued that, in addition to the IAC claim raised in his first petition, his trial counsel was deficient in not investigating his intellectual disability (IAC-ID claim). He based this claim on an affidavit from Dr. Antolin Llorente, a psychologist who performed a series of neuropsychological tests, reviewed various records, examined Guevara, and interviewed three other individuals by telephone. He presented a full-scale IQ score of 77 on the Test of Nonverbal Intelligence, Second Edition (TONI-2), as well as sections of various other IQ tests for which his scores ranged from 60 to 91. Much of his findings conflicted with Vitale's report of Guevara's abilities. The Texas Court of Criminal Appeals denied Guevara's initial application and found that state procedural law prevented consideration of his successive application.

Guevara next filed a federal habeas suit in district court. While the case was pending in the district court, the Supreme Court decided *Martinez v.*

*Ryan*, which recognized that an attorney's incompetence in an initial-review state post-conviction proceeding can establish cause for a procedural default of an ineffective assistance of counsel claim. 132 S. Ct. 1309, 1320 (2012). The district court ordered briefing on *Martinez.* Shortly thereafter, we issued our opinion in *Ibarra v. Thaler* holding that, because of the way Texas configured its appellate and post-conviction review, *Martinez* did not apply to Texas inmates. *Ibarra v. Thaler*, 687 F.3d 222, 225–27 (5th Cir. 2012). After the district court issued its opinion in this case, the Supreme Court overruled *Ibarra* in *Trevino v. Thaler,* 133 S. Ct. 1911 (2013).

The district court denied the IAC claim raised in the initial state post-conviction application on the ground that 28 U.S.C. § 2254(d) precluded federal relief. The court denied the ineffective assistance of counsel claim regarding ID, presented in the successive state post-conviction application, on the ground that it was procedurally defaulted. It explained in a footnote that under *Ibarra* it could not forgive the default. It also briefly addressed the merits of the IAC-ID claim, explaining that this circuit has previously found no *Strickland* prejudice in failing to present evidence of low IQ. After requesting additional briefing on Guevara's substantive *Atkins* claim, it found that he had not established a prima facie *Atkins* claim in state habeas court and denied his petition under § 2254(d). It denied a COA on all issues. Guevara filed a timely Notice of Appeal.

## II.

"[W]hen a habeas corpus petitioner seeks to initiate an appeal of the dismissal of a habeas corpus petition . . . the right to appeal is governed by the certificate of appealability requirements." *Slack v. McDaniel*, 529 U.S. 473, 478 (2000). Section 2253 of the Antiterrorism and Effective Death Penalty Act ("AEDPA") addresses appeals of denials of habeas corpus petitions. It provides

that "an appeal may not be taken" from a final order in a habeas corpus proceeding without a COA. 28 U.S.C. § 2253(c)(1). A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

"Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484. In other words, a COA should issue if it is debatable whether "the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Id.* at 483–84 (internal quotation marks omitted) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 894 (1983)). Similarly, "when the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue (and an appeal of the district court's order may be taken) if the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* at 478, 484 (emphasis added). "[B]oth showings [must] be made before the court of appeals may entertain the appeal." *Id.* at 485.

"The question is the debatability of the underlying constitutional claim, not the resolution of that debate." *Cardenas v. Dretke*, 405 F.3d 244, 248 (5th Cir. 2005). In deciding whether to grant a COA, we "consider only whether the district court's application of [AEDPA] deference to the petitioner's claim is debatable among jurists of reason." *Id.* at 248–49 (citing *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003) (emphasis omitted).

### III.

Guevara seeks habeas relief on two grounds: (1) ineffective assistance of counsel under *Wiggins v. Smith*, 539 U.S. 510 (2003) for failing to conduct an adequate mitigation investigation; and (2) death ineligibility under *Atkins*. However, there are two distinct IAC claims—the original IAC claim that his counsel was constitutionally deficient for failing to conduct an adequate mitigation investigation (IAC claim) and the subsequent IAC claim that his counsel was constitutionally deficient for failing to investigate intellectual disability (IAC-ID claim). We will address the IAC claim, the IAC-ID claim, and the *Atkins* claim in turn.

### A.

Guevara argues that his trial counsel's investigation preceding the punishment phase of his trial was unreasonably limited. He claims that his counsel conducted no mitigation investigation whatsoever and that such an investigation would have uncovered powerful evidence of, *inter alia*, a troubled childhood, PTSD, and immigrant trauma. His arguments are unavailing.

In order to prevail on an IAC claim, a defendant must show that (1) his counsel's performance was so deficient as to fall below an objective standard of reasonableness, and (2) that he was prejudiced by counsel's conduct. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim. *Id.* at 700. On federal review of a habeas claim alleging IAC, *Strickland*'s standards merge with the AEDPA into a "doubly deferential" standard. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). "When § 2254(d) applies . . . [t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Premo v.*

*Moore*, 131 S. Ct. 733, 740 (2011) (citation and internal quotation marks omitted).

Even assuming arguendo that Guevara's counsels' investigation was unreasonably deficient, his IAC claim fails on the prejudice prong. The actual-prejudice inquiry requires an inmate to show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694; *see also Wiggins*, 539 U.S. at 534. In a death penalty case such as this one, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. If the "evidence of . . . future dangerousness was overwhelming . . . it is virtually impossible to establish prejudice." *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002).

The aggravating circumstances in this case were extraordinary. Guevara had a long history of escalating violence and cruelty. Before the two murders at the center of this case, he had fired shots and inflicted permanent injuries during the course of robberies. He had bragged about his robberies and the injuries he had inflicted, while using racial slurs to refer to his victims. Perhaps most aggravating, only hours after committing the murders for which the jury convicted him, Guevara killed a security officer to steal his gun. Moreover, any information about his difficult life in El Salvador would have been undermined by both his brother's clean record despite their shared childhood and the fact that one of his victims was from El Salvador and experienced the same atrocities.

In sum, we conclude that reasonable jurists could not debate the district court's assessment of Guevara's initial IAC claim. *See Slack*, 529 U.S. at 484. Accordingly, we deny Guevara's petition for a COA for the claim that his

counsel was constitutionally ineffective for failing to conduct an adequate mitigation investigation.

**B.**

Guevara next turns to his IAC claim for failing to investigate the possibility of intellectual disability for mitigation purposes, which was contained in his successive habeas application. As noted above, the district court found the IAC-ID claim procedurally defaulted. However, it also briefly addressed the merits, explaining that failing to present evidence of "low IQ" is not prejudicial under *Strickland*. Guevara argues that this claim should be remanded to the district court, in light of *Trevino v. Thaler*, 133 S. Ct. 1911 (2013).[2] We disagree.

When this case was pending before the district court, the Supreme Court decided *Martinez v. Ryan*, which held that IAC at initial-review collateral proceedings may establish cause for the procedural default of a claim of ineffective assistance at trial. 132 S. Ct. 1309 (2012). Under *Martinez*, a default is excused where (1) state habeas counsel was ineffective under *Strickland* and (2) the underlying IAC claim "is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Id.* at 1318. Even if a petitioner makes both of these showings, he is not automatically entitled to habeas relief. *Id.* at 1320. Rather, "[i]t merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted." *Id.*

After the district court requested additional briefing on *Martinez*, the Fifth Circuit decided that because of Texas's habeas procedural structure

---

[2] Guevara also addresses the merits of his IAC-ID claim. His arguments mirror those given in support of his initial IAC claim. In short, he contends that any reasonable attorney would have investigated for ID in this case and that a mental health evaluation aimed at intellectual disability would have yielded mitigation evidence at trial. We decline to grant a COA on these grounds. Our analysis in part II.A. applies with equal force to this claim.

*Martinez* did not apply to Texas inmates. *Ibarra*, 687 F.3d at 225. Subsequent to the district court's order finding Guevara's IAC-ID claim procedurally barred, however, the Supreme Court has explicitly overruled *Ibarra* and held that *Martinez* does apply to Texas inmates. *Trevino v. Thaler,* 133 S. Ct. 1911 (2013).

Guevara's argument for remand rests on an assumption that because the IAC-ID claim was procedurally defaulted, it was not decided on the merits. According to Guevara, therefore, *Martinez* and *Trevino* mandate that the district court review the merits of this claim. *Martinez*'s remedy of consideration of the merits of a defaulted IAC claim is inapplicable here, however, because the district court fully considered the merits of the IAC-ID claim in its alternate holding.

This conclusion is supported by our post-*Trevino* cases considering procedurally defaulted claims. We recently held that where "the district court, in its alternative holding, rejected his constitutional claims on the merits, [the petitioner] cannot obtain a COA unless he also demonstrates that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Newbury v. Stephens*, 10-70028, 2014 WL 2958635, at *20 (5th Cir. July 1, 2014) (internal quotation marks omitted) (citing *Slack*, 529 U.S. at 484). In *Newbury*, the court noted that "the district court thoroughly and carefully considered all of the evidence that [the petitioner] presented . . . and held that [his IAC] claim lacks merit because he can demonstrate neither deficient performance nor prejudice under *Strickland*." *Id.* at *21. Therefore, because Newbury

> already received all of the relief available to him under the
> authority of *Martinez* and *Trevino*, that is, review of the merits by
> a federal court, it is not necessary for us to remand the case to the
> district court to determine whether Newbury's state habeas
> counsel was ineffective or whether his [IAC] claim has 'some merit'

under *Martinez*.    All that we need to determine is whether reasonable jurists would find debatable the district court's decision that Newbury's [IAC] claim lacks merit under *Strickland*.

*Id.*; *see also Wilkins v. Stephens*, 560 F. App'x 299, at *4–12 (5th Cir. 2014) (per curiam) (unpublished) (denying a COA where the district court determined that the claims were procedurally barred but alternatively concluded that there was no merit to petitioner's IAC claims).

Here, the district court addressed the merits of the IAC-ID claim and found that Guevara could not demonstrate prejudice.[3]  It provided case law to support the holding that failing to present evidence of low IQ was not prejudicial to Guevara.  The district court's treatment of the issue was not cursory.  Although the district court was incorrect in its procedural ruling in light of *Trevino*, there is no need to remand the claim back to the district court to determine whether Guevara's state habeas counsel was ineffective or whether his IAC claim has some merit under *Martinez*.   Guevara has already received the relief mandated by *Martinez* and *Trevino*—review of the merits by a federal court.

All we must determine is whether reasonable jurists would find debatable the district court's decision that Guevara's IAC-ID claim lacks merit under *Strickland*.  We conclude that reasonable jurists could not debate the district court's decision that Guevara was not prejudiced.  There is not a reasonable probability that, given the evidence of low IQ, the jury would have answered the special issues questions in a way that did not require the death

---

[3] In *Gates v. Stephens* this court granted a COA and remanded five of petitioner's IAC claims in light of *Trevino*.  548 F. App'x 253, at *1 (5th Cir. 2013), as amended (Mar. 19, 2014) (per curiam) (unpublished).  In *Gates*, the district court also addressed the merits, albeit in a cursory fashion and in a footnote.  *See Gates v. Thaler*, 2011 WL 4370182, at *4 n.6 (S.D. Tex. May 31, 2011).  The district court simply wrote that it "reviewed the allegations Gates makes in his first five points of error and dismisses them with confidence that, if habeas procedure allowed for plenary federal review, his claims would not merit habeas relief." *Id.*

penalty.   As explained above, the aggravating evidence was overwhelming. Furthermore, the IQ tests that Guevara did present in state habeas court were inconclusive and mostly incomplete, with scores ranging from 60 to 91.   The Court in *Atkins* noted that low IQ that does not clearly indicate intellectual disability "can be a two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury."   536 U.S. at 321; *see also Boyd v. Johnson*, 167 F.3d 907, 910 (5th Cir. 1999).   This point is particularly relevant here, where there is powerful evidence of future dangerousness.   Accordingly, we decline to grant a COA as to the claim that Guevara's counsel was ineffective for failing to present evidence of intellectual disability.

## C.

In his subsequent habeas petition, Guevara also raised a substantive *Atkins* claim.   In this claim, Guevara argued that he is ineligible for the death penalty because he is an individual with intellectual disability.   The district court reviewed the claim under the AEDPA, finding that Guevara did not show his *Atkins* claim entitles him to relief under the AEDPA's deferential standards.    Guevara alleges that he presented prima facie evidence of intellectual disability and that the state court's ruling to the contrary is an unreasonable application of federal law.   Therefore, he argues, the decision should not have received AEDPA deference.   Guevara also argues that he should be granted a COA in light of the recent Supreme Court decision *Hall v. Florida*, which rejected Florida's use of a strict IQ test score cutoff of 70 for *Atkins* purposes.   134 S. Ct. 1986, 1990 (2014).   We find his arguments unavailing.   Accordingly, we decline to grant a COA as to this claim.

In *Atkins v. Virginia*, the Supreme Court held that under the Eighth Amendment's "evolving standards of decency," "death is not a suitable

punishment for a [intellectually disabled] criminal." 536 U.S. at 321 (internal quotation marks omitted). However, *Atkins* "did not provide definitive procedural or substantive guides for determining when a defendant is [intellectually disabled]." *Hearn v. Thaler*, 669 F.3d 265, 272 (5th Cir. 2012) (internal quotation marks omitted). Rather, states must decide for themselves how to measure intellectual disability. Under Texas law, an *Atkins* claim requires the following showing: "(1) significantly sub-average general intellectual functioning; (2) accompanied by related limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18." *Ex parte Briseno,* 135 S.W.3d 1, 7 (Tex. Crim. App. 2004) (internal quotation marks omitted). "Significantly sub-average general intellectual functioning" has been defined in Texas as an IQ of about 70 or below. *Id.* at 7 n.24. This court has further explained that:

> The medical authorities cited by the court in *Briseno* also noted: Psychologists and other mental health professionals are flexible in their assessment of [intellectual disability]; thus, sometimes a person whose IQ has tested above 70 may be diagnosed as mentally retarded while a person whose IQ tests below 70 may not be [intellectually disabled].

*Hearn*, 669 F.3d at 669 (citing *Briseno*, 135 S.W.3d at 7).

In *Hall v. Florida,* the Supreme Court concluded that mandatory, strict IQ test cutoffs are unconstitutional. *Hall,* 134 S. Ct. at 1990. In *Hall,* "the Court focused largely on the prohibition of sentencing courts' considering even substantial, additional evidence of retardation—including poor adaptive functioning—for defendants who do not have an IQ score below 70." *Mays v. Stephens*, 13-70037, 2014 WL 2922295, at *6 (5th Cir. June 27, 2014) (citing *Hall*, 134 S. Ct. at 1994, 2001). The Court "agree[d] with the medical experts that when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional

evidence of intellectual disability, including testimony regarding adaptive deficits." *Hall*, 134 S. Ct. at 2001.

We have declared that *Hall* "in no way affects this court's reading and application of *Briseno*." *Mays*, 2014 WL 2922295 at \*6. We explained that "Texas has never adopted the bright-line cutoff at issue in *Hall*." *Id.* We further explained that "[t]he cutoff at issue in *Hall* was problematic largely because it restricted the evidence [] that could be presented to establish intellectual disability," but there is "no similar restriction of evidence under *Briseno*." *Id.*

Guevara did not make a prima facie case for an intellectual disability. In state habeas proceedings he presented no full-scale results from an accepted IQ test. He presented a full-scale IQ score of 77 on one test, the TONI-2, which Texas courts do not find to be a valid measure of intellect. *See Maldonado v. Thaler*, 625 F.3d 229, 240–41 (5th Cir. 2010). On various sections of various other IQ tests, his scores ranged from 60 to 91. He presented no evidence at all that any intellectual disability he had appeared before the age of 18. His expert's evidence conflicted with much of the other evidence presented about Guevara's intellectual abilities, such as his ability to excel at various jobs and learn new skills. Thus, the district court properly analyzed this claim under the AEDPA.

We conclude that reasonable jurists could not debate the underlying constitutional claim. The district court's ruling is amply supported by the record. The record showed evidence of Guevara's intellectual abilities, work performance, and an absence of adaptive limitations. Dr. Llorente's affidavit, on which Guevara bases his *Atkins* claim, conflicts with much of the other evidence in the record. Moreover, in light of *Mays*'s holding that *Hall* "in no way affects this court's reading and application of *Briseno*," *Mays*, 2014 WL

No. 13-70003

2922295 at *6, Guevara's arguments regarding the constitutionality of *Briseno* fall short. Accordingly, we decline to issue a COA as to Guevara's substantive *Atkins* claim.

## IV.

For the foregoing reasons, we DENY Guevara's application for a COA.